IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| IN THE MATTER OF THE APPLICATION FOR SEARCH WARRANT FOR information associated with **kmstegmanks@gmail.com**, that is stored at premises owned, maintained, controlled, or operated by Google Online Services, a company whose Custodian of Records is located at 1600 Amphitheatre Parkway, Mountain View, California | Case No. 15-mj-5091-KGS<br><br>**FILED UNDER SEAL** |

## AFFIDAVIT IN SUPPORT OF SEARCH WARRANT

I, Bradley Cooper, Special Agent of the United States Food and Drug Administration,

Office of Criminal Investigations ("FDA-OCI"), after being duly sworn, declare as follows:

### INTRODUCTION

1.     This Affidavit is offered in support of an application for the issuance of a search

warrant to search the Google (or GMAIL) electronic mail account of

"kmstegmanks@gmail.com".  A description of the account is set forth in Attachment A to this

affidavit.  The information in this Affidavit is based on my personal knowledge, information

obtained through the review of documents, information provided to me by local and other federal

law enforcement officers, information provided by personnel at the United States Food and Drug

Administration ("FDA"), and information provided by cooperating individuals.

2.     The request for authorization to conduct a search of kmstegmanks@gmail.com is

based upon the development of facts which provide probable cause to believe that Midwest

Medical and its owner, Kathleen Stegman, are involved in an ongoing scheme to defraud drug

manufacturers and wholesalers, Midwest Medical's clients, and others by receiving misbranded

drugs/devices in interstate commerce and delivering those drugs/devices to clients, and illegally dispensing prescription drugs to clients.

3.      Specifically, the investigation has revealed that Midwest Medical and Kathleen Stegman order prescription drugs and devices without a licensed practitioner's prescription or order.  Kathleen Stegman then dispenses these drugs and devices to clients.

4.      The investigation has also revealed that Kathleen Stegman is making false statements to drug and device manufacturers and wholesalers to open accounts in the names of physicians ostensibly associated with Midwest Medical, who ostensibly treat Midwest Medical's clients, and who ostensibly order prescription drugs and devices for the clients.  Kathleen Stegman submits these applications, using the physicians' names and medical licenses, without the physicians' knowledge or authorization.  These applications then serve as "signatures on file" that allow Kathleen Stegman to submit orders for prescription drugs and devices which have never been actually ordered by a licensed physician.

5.      The facts detailed in this Affidavit provide probable cause to believe Midwest Medical's distribution of prescription drugs and prescription devices violates numerous provisions of federal law, including:  (1) 21 U.S.C. § 331(c), receiving in interstate commerce a misbranded and/or adulterated drug and/or device, and the delivery or proffered delivery thereof for pay or otherwise; (2) 21 U.S.C. § 331(k), doing any act to a drug or device, while such drug or device is held for sale after shipment in interstate commerce, which results in the drug being misbranded; (3) 18 U.S.C. §§ 1341 and 1343, executing a scheme to defraud through use of the mails or interstate wire; (4) 18 U.S.C. § 1028A, aggravated identity theft; and (5) 18 U.S.C. § 1512, obstruction of justice.  In addition, there is probable cause to believe that evidence of these

2

unlawful activities will be found in the e-mail account.  A description of the items to be searched and seized as evidence is set forth in Attachment B to this Affidavit.

6.      As this Affidavit is submitted solely for the purpose of establishing probable cause to support the issuance of a search warrant, this Affidavit does not set forth all facts and circumstances known to me or to other investigators regarding this matter.

## BACKGROUND OF AFFIANT

7.      I am a Special Agent with FDA's Office of Criminal Investigations ("FDA-OCI") assigned to the Kansas City, Kansas Field Office, located in Mission, Kansas.  As a Special Agent, I am responsible for investigating violations of the Federal Food, Drug, and Cosmetic Act ("FDCA"), 21 U.S.C. §§ 321, *et seq.*, and various health care fraud offenses.  I have been a Special Agent with FDA-OCI since March 2015.  Before March 2015, I was a Special Agent with the United States Office of Personnel Management Office of the Inspector General for four (4) years and was an Investigator for the U.S. Department of Labor - Employee Benefits Security Administration for three (3) years.  During my career, I have conducted investigations into various types of white collar crime.

## MIDWEST MEDICAL AND KATHLEEN STEGMAN

8.      Midwest Medical is what is known as a "medical spa", engaged in both medical practices (such as cosmetic injections) and aesthetics (such as facials and chemical peels).  Under Kansas law, a "medical spa" is considered to be delivering medical services; therefore, Kansas requires that a licensed physician be both an owner and a participant in the business.  The level of the physician's participation depends on the licensure of the other owners/employees of the business.

3

9.      As a part of its medical practice of injecting patients/clients with products to improve their appearance, Midwest Medical orders prescription drugs (*e.g.*, Botox® and Dysport®) and prescription devices (*e.g.*, fillers such as Restalyne®, Perlane®, Juvederm®, and Artefill®) from various manufacturers and wholesalers located throughout the United States. Those orders are often made by telephone (interstate wire), or computer (interstate wire), and are shipped using the mail, either the United States Postal Service or commercial carriers, such as Federal Express or United Parcel Service.  Midwest Medical, through owner Kathleen Stegman, then dispenses, administers, and/or delivers those prescription drugs and devices to Midwest Medical's clients via injection.

10.     Midwest Medical advertises its services in magazines and on the Internet, using the Internet address:  www.lookmybest.net.  Recent magazine ads for Midwest Medical included the following statements:  "Because aging is optional . . . give me 45 minutes and I will take off 15 years!  Trust Kathleen with your face . . . ."  Midwest Medical also advertises its services through Groupon and other coupon websites, offering reduced rates for Botox® and Dysport®. For example, on www.crowdsavings.com, Midwest Medical offered 20 units of  Botox®or 50 units of Dysport® for $149.[1]

11.     Kathleen Stegman is not a physician; she is a Registered Nurse.  Under Kansas law, a Registered Nurse cannot independently practice medicine.[2]  Instead, a Registered Nurse is only licensed to execute the medical regimen as prescribed by a person licensed to practice medicine and surgery or dentistry by carrying out the orders of such a licensed person

---

[1] According to Allergan, 100 units of Botox® cost $558, or $111.60 for 20 units.  At $149 for 20 units of Botox®, Midwest Medical grosses only $37.40 per injection of 20 units.
[2] The practice of medicine is defined in Kan. Stat. Ann. § 65-2869.

(hereinafter "physician").  A Registered Nurse cannot prescribe prescription drugs/devices, but can only administer prescription drugs/devices based on a physician's pre-existing order.  *See* Kan. Stat. Ann. § 65-1113(d)(1).  In other words, as a Registered Nurse, Kathleen Stegman may only act upon the orders of a licensed physician.

12.     The investigation has revealed that a series of physicians has been associated with Midwest Medical throughout its existence.  Since 2009, those physicians and their approximate dates of association have been:

| Name | Approximate Start Date | Approximate End Date |
|------|------------------------|----------------------|
| Dr. Frederick Buck | Unknown | May 18, 2009 |
| Dr. Craig Schuman | May 19, 2009 | June 15, 2011 |
| Dr. Thomas Heaphy | May 1, 2011 | December 15, 2014 |
| Dr. Maryann Campbell | December 23, 2014 | March 6, 2015 |
| Dr. Gael Wheeler | March 6, 2015 | Present |
| Dr. Mark Strehlow | March 31, 2015 | Present |

13.     Generally, the investigation has revealed that at least since 2011, when Dr. Heaphy became associated with Midwest Medical, Kathleen Stegman has been providing medical services to clients, including injections of prescription drugs and devices, without the involvement of or prior orders/prescriptions of a physician.  As will be described below, given her actions,  Kathleen Stegman has not only been practicing medicine without a license, in violation of state law, but she also has been engaged in  the illegal dispensing of prescription drugs and devices for years.

## APPLICABLE LAW

### A.    The Federal Food, Drug, And Cosmetic Act

14.    The FDA is the federal agency responsible for protecting the health and safety of the American public by ensuring, among other things, that drugs and medical devices are safe and effective for their intended uses and bear labeling that contains true and accurate information.  FDA's responsibilities include regulating the manufacture and distribution of drugs, including prescription drugs, and medical devices shipped or received in interstate commerce, as well as the labeling of such drugs and medical devices.  FDA carries out its responsibilities by enforcing the FDCA and other pertinent laws and regulations.

### *Interstate Commerce*

15.    The FDCA defines interstate commerce as "(1) commerce between any State or Territory and any place outside thereof, and (2) commerce within the District of Columbia or within any other territory not organized with a legislative body."  21 U.S.C. § 321(b).

### *Drugs, Prescription Drugs, and New Drugs*

16.    The FDCA defines a "drug" to include "articles intended for use in the diagnosis, cure, mitigation, treatment, or prevention of disease in man" and "articles . . . intended to affect the structure or any function of the body of man or other animals."  21 U.S.C. §321(g)(1)(B) and (C).

17.    Prescription drugs are drugs that, because of their toxicity and other potential for harmful effects, are not safe for use except under the supervision of a practitioner licensed by law to administer such drugs.  21 U.S.C. § 353(b)(1)(A).  A drug is also a prescription drug if the FDA requires it to be administered under the supervision of a practitioner licensed by law to

administer such drug as a condition of the FDA's approval of the drug.  21 U.S.C. §
353(b)(1)(B).

     18.     Relevant to this investigation, Botox®, Dysport®, and other similar products are
prescription drugs under the FDCA.

     19.     Under the FDCA, a "new drug" is any drug which was not generally recognized,
among experts qualified by scientific training and experience to evaluate the safety and
effectiveness of drugs, as safe and effective for use under the conditions prescribed,
recommended, or suggested in the labeling thereof.  21 U.S.C. § 321(p)(1).  To be lawfully
introduced into interstate commerce for commercial distribution, new drugs require an approved
marketing application, including new drug applications ("NDAs") or abbreviated new drug
applications ("ANDAs").  21 U.S.C. § 355.

     20.     The approval for the marketing of a "new drug" covers only the drug described in
the NDA or ANDA.  A new drug which, or the labeling of which, is slightly different, in any
manner whatsoever, from what was described in the NDA or ANDA is not considered the same
drug, and cannot be lawfully marketed for commercial distribution without its own separately
approved NDA or ANDA.  In other words, an approved NDA authorizes a sponsor to
manufacture and distribute only the exact drug described in the application.  Manufacturing must
occur only at facilities authorized under the approved NDA or ANDA; the drug may bear only
the FDA-approved package insert; and the drug may be distributed by the manufacturer only for
uses prescribed, recommended, or suggested in the FDA-approved labeling.

7

***Medical Devices***

21.     The FDCA defines a "device" as, among other things, "an instrument, apparatus, implement, machine, contrivance, implant, in vitro reagent, or other similar or related article, including any component, part, or accessory, which is . . . intended for use in the diagnosis of disease or other conditions, or in the cure, mitigation, treatment, or prevention of disease, in man or other animals, or intended to affect the structure or function of the body of man or other animals, and which does not achieve its primary intended purposes through chemical action within or on the body of man or other animals and which is not dependent upon being metabolized for the achievement of its primary intended purposes." 21 U.S.C. §§ 321(h)(2), 321(h)(3).

22.     Medical devices are classified into one of three categories: Class I (lowest risk), II, or III (highest risk). 21 U.S.C. § 360c. A device's class determines the type of regulatory controls to which it is subject and any process it must complete prior to marketing. With the exception of certain devices that are exempt from premarket review, "new" devices that come on the market are automatically classified into Class III as a matter of law, and require full premarket approval. 21 U.S.C. §§ 360c(f)(1) and 360e(a).

23.     The only way a manufacturer can remove a new device from the automatic, statutory Class III designation, and thereby avoid the premarket approval process, is to obtain an order from the FDA, reclassifying the device into Class I or II (see 21 C.F.R. Part 860, Subpart C-Reclassification), or an order finding the new device "substantially equivalent" to a legally marketed ("predicate") device that does not require premarket approval. 21 U.S.C. §§ 360c(f), 360e(a) and (b); 21 C.F.R. §§ 807.92 and 807.100.

8

24.     A prescription device is a device which, because of its potential for harmful effects, methods of use, or the collateral measures necessary to its use, is not safe for use except under the supervision of a practitioner licensed by law to direct the use of such device. 21 C.F.R. § 801.109.

25.     A device is "adulterated" for purposes of the FDCA if it is a Class III device and it has not received FDA approval, or is not exempt from the requirement of FDA approval. 21 U.S.C. § 351(f)(1).

26.     Relevant to this investigation, cosmetic fillers like Restylane®, Perlane®, Juvederm®, Artefil®, and other similar products are prescription devices.

**Labels and Labeling**

27.     The FDCA defines "label" as "a display or written, printed, or graphic matter upon the immediate container of any article." 21 U.S.C. § 321(k).

28.     The FDCA defines "labeling" as all labels and other written, printed, or graphic matter (1) upon any article or any of its containers or wrappers, or (2) accompanying such article. 21 U.S.C. § 321(m).

**Misbranded Drugs**

29.     Under the FDCA, drugs and devices are deemed to be "misbranded" unless their labeling bears adequate directions for use. 21 U.S.C. § 352(f)(1). Under regulations promulgated by the FDA, "adequate directions for use" is defined as directions under which a layman can safely use a drug or device for its intended uses. 21 C.F.R. §§ 201.5 (drugs) and 801.5 (devices).

9

30.     Prescription drugs and devices by their very nature are safe for use only under the supervision of a licensed practitioner. *See* 21 U.S.C. § 353(b)(l)(A) and 21 C.F.R. § 801.109. Adequate directions for use, therefore, cannot be written for prescription drugs and devices, and they are presumptively misbranded under the FDCA. *See, e.g.,* 21 U.S.C. § 353(b); 21 C.F.R. §§ 201.5, 801.5, 801.109.[3]  To allow for the lawful movement of prescription drugs and devices in interstate commerce, FDA regulations exempt prescription drugs and devices from the adequate-directions-for-use requirement if they meet certain conditions. *See* 21 C.F.R. §§ 201.100 (drugs) and 801.109 (devices).

31.     One such condition requires that labeling on or within the package from which the drug or device is to be dispensed bears adequate information for its use, including indications, effects, routes, methods, and frequency and duration of administration, and any relevant hazards, contraindications, side effects, and precautions under which practitioners licensed by law to administer the drug or device can use the drug or device safely and for the purposes for which it is intended, including all purposes for which it is advertised or represented. *See* 21 C.F.R. §§ 201.100(c)(1) (drugs) and 801.109(c) (devices).  For prescription drugs subject to the new drug approval requirement, this labeling must be the same one approved in the NDA or ANDA for that drug.  21 C.F.R. § 201.100(c)(2).

32.     In addition, for prescription devices specifically, other conditions for exemption from the adequate directions for use requirement are:

---

[3] *See also, United States v. Regenerative Sciences, LLC*, 741 F.3d 1314, 1324 (D.C. Cir. 2014); *United States v. Williams*, 549 F3d. Appx. 813, 816 (10th Cir. 2013); *United States v. An Article of Device*, 731 F.2d 1253, 1261 (7th Cir. 1984); *United States v. Evers*, 643 F.2d 1043, 1051 (5th Cir. 1981); *United States v. Articles of Drug*, 625 F.2d 665, 673 (5th Cir. 1980).

(a)     that the prescription device's label bear the statement: "Caution: Federal law

restricts this device to sale by or on the order of a physician/dentist/veterinarian."

21 C.F.R. § 801.109(b)(1);

(b)     that the device was in the possession of a person, or his agents or employees,

regularly and lawfully engaged in the manufacture, transportation, storage, or

wholesale or retail distribution of such device; or in the possession of a

practitioner, such as physicians, dentists, and veterinarians, licensed by law to use

or order the use of such device; and

(c)     the device was only intended for sale to or on the prescription or other order of a

licensed practitioner for use in the course of their professional practice.

33.     Thus, prescription devices in the possession of any person other than those

described in paragraph 32(b) above are misbranded pursuant to 21 U.S.C. § 352(f)(1).  21 C.FR.

§ 801.109.

34.     Drugs and devices are also "misbranded" under the FDCA if any word, statement,

or other information, required to appear on the drug's or device's label or labeling, is not

prominently placed thereon.  21 U.S.C. § 352(c).  Under FDA regulations, a drug or device may

be misbranded under section 352(c) unless "[a]ll words, statements, and other information

required by or under authority of the act to appear on the label or labeling shall appear thereon in

the English language . . . ."  *See* 21 C.F.R. §§ 21 C.F.R. 201.15(c)(1) (drugs) and 801.15(c)(1)

(devices).

11

35.     Under the FDCA, the act of dispensing a prescription drug without the valid prescription of a practitioner licensed by law to administer such drugs is deemed to be an act that misbrands the drug while held for sale.  21 U.S.C. § 353(b)(1).

36.     A prescription drug is also "misbranded" if its label does not bear the symbol "Rx only" at any time prior to dispensing.  21 U.S.C. § 353(b)(4)(A).

37.     In this case, the prescription drugs/devices were ordered, prescribed, and dispensed by Kathleen Stegman without the proper authorization, order, and/or prescription of a licensed physician.  Consequently, the prescription drugs/devices could not satisfy the applicable conditions of exemption from the requirement to bear adequate directions for use, and thus, were misbranded under 21 U.S.C. § 352(f)(1).  In addition, the prescription drugs dispensed and/or administered by Kathleen Stegman without a valid prescription from a licensed practitioner were deemed to be misbranded while held for sale under 21 U.S.C. § 353(b)(1).

*Foreign Market Drugs and Devices*

38.     Drugs approved for foreign markets will almost always be unapproved drugs under United States law, even if chemically identical to the U.S.-approved version.  Foreign drugs may have different labeling (including different warnings, dosage recommendations, and indications for use) and may be manufactured in some place other than the location approved in the U.S. approval process.  *See In re Canadian Import Antitrust Litigation*, 470 F.3d 785, 790 (8th Cir. 2006) ("Because foreign labeling differs from domestic labeling, approval granted to a particular manufacturer for a particular product to be distributed in the United States does not constitute approval of another drug—even one with the same chemical composition—to be distributed in Canada with different labeling, and then imported into the United States.")

12

39.    Likewise, foreign market prescription devices will almost always be "adulterated" under the FDCA because they will differ from the FDA-approved versions, including that the foreign market devices may have different labeling (including different warnings and indications for use) and may be manufactured somewhere other than the location approved during the U.S. approval process.

40.    In addition, foreign market versions of FDA-approved drugs will almost always be "misbranded" under the FDCA because: (1) their label does not bear the statement "Rx only" as required by 21 U.S.C. § 353(b)(4); and (2) they do not meet the exemption from the FDCA's requirement that the drug's labeling bear adequate directions for use.  More specifically, the labeling approved by foreign regulatory authorities differs from the FDA-approved labeling that must accompany the product for the exemption in 21 C.F.R. § 201.100 to apply.

41.    Likewise, foreign market versions of FDA-approved prescription devices will almost always be "misbranded" under the FDCA because they often do not meet the exemption from the FDCA's requirement that the drug's labeling bear adequate directions for use.   More specifically, the label for the foreign market version of the prescription device generally will not contain the statement: "Caution: Federal law restricts this device to sale by or on the order of a physician/dentist/veterinarian," which is required for the exemption in 21 C.F.R. § 801.109 to apply.

***Statutory Prohibitions***

42.    The FDCA prohibits doing and causing the following acts:

(a)    the receipt in interstate commerce of any drug or device that is misbranded and the delivery or proffered delivery thereof for pay or otherwise.  *See* 21 U.S.C. § 331(c); and

13

> (b)     the doing of any act with respect to a drug or device that causes the drug or device to become misbranded, if such act is done while such article is held for sale (whether or not the first sale) after shipment in interstate commerce. *See* 21 U.S.C. § 331(k).

43.     Any person who commits a prohibited act under the FDCA commits a misdemeanor, regardless of any *mens rea*, punishable by a maximum of imprisonment for one year and a $100,000 fine.  21 U.S.C. § 333(a)(1) and 18 U.S.C. § 3571.  If committed with the intent to defraud or mislead, or if a person commits a violation of § 331 after a prior conviction under the FDCA, the violation constitutes a felony and is punishable by up to three years imprisonment and a $250,000 fine.  21 U.S.C. § 333(a)(2) and 18 U.S.C. § 3571.

**B.     Title 18 Violations**

**1.     Mail and Wire Fraud**

The federal mail and wire fraud statutes, 18 U.S.C. §§ 1341 and 1343, prohibit the use of the mails and interstate wires in executing a scheme to defraud, or in obtaining money or property by means of false or fraudulent pretenses, representations, or promises.

**2.     Aggravated Identity Theft**

If, in relation to the commission of mail or wire fraud a person knowingly uses, without lawful authority, a means of identification of another person, the person has committed the federal crime of aggravated identity theft, in violation of 18 U.S.C. § 1028A.

**3.     Obstruction of Justice**

It is a violation of 18 U.S.C. § 1512(b)(3) to corruptly persuade, or attempt to corruptly persuade another person with the intent to prevent communication of a possible violation of federal law to a law enforcement officer.  It is a violation of 18 U.S.C. § 1512(c)(1) to corruptly

14

destroy a document to prevent its use in an official proceeding.  It is a violation of 18 U.S.C. §

1512(c)(2) to corruptly obstruct, influence, or impede any official proceeding or attempt to do so.

**C.**     **Relevant Kansas Statutes and Regulations**

44.     Because the FDCA requires that a licensed practitioner order and dispense, or

supervise the dispensing of, prescription drugs and devices, this investigation involves the

intersection of federal and state law.  I and other FDA-OCI agents have consulted with the

Kansas Board of Nursing and the Kansas Board of Healing Arts regarding the statutes and

regulations applicable to Kathleen Stegman and Midwest Medical.

45.     In the state of Kansas, a Registered Nurse like Kathleen Stegman cannot

independently practice medicine.   Instead, a Registered Nurse is only licensed to execute the

medical regimen as prescribed by a person licensed to practice medicine and surgery or dentistry

by carrying out the orders of such a licensed person.  A Registered Nurse cannot prescribe or

order prescription drugs/devices, but can only administer prescription drugs/devices based on a

physician's pre-existing order.

46.     The practice of medicine in Kansas is defined as those –

> persons who prescribe, recommend or furnish medicine or drugs, or
> perform any surgical operation of whatever nature by the use of any
> surgical instrument, procedure, equipment or mechanical device for the
> diagnosis, cure or relief of any wounds, fractures, bodily injury, infirmity,
> disease, physical or mental illness or psychological disorder, of human
> beings. Kan. Stat. Ann. § 65-2869.

47.     It is unlawful for any person who is not licensed under the Kansas Healing Arts

Act to engage in the practice of medicine.  Kan. Stat. Ann. § 65-2803.  Kansas regulations

indicate further that nurses practicing their profession when licensed and practicing in

accordance with the Kansas Nursing statutes are not considered to be in the practice of medicine. Kan. Stat. Ann. § 65-2872.

48.     Representatives from the Kansas State Board of Nursing and the Kansas State Board of Healing Arts have indicated that performing procedures involving cosmetic injections, whether the injections are of prescription drugs or devices, is considered the practice of medicine.

## PRIOR DISCIPLINARY ACTIONS AGAINST KATHLEEN STEGMAN

49.     Kathleen Stegman has a long history of disciplinary action involving regulatory agencies in the state of Kansas.  Three of those disciplinary actions involving Kathleen Stegman and Midwest Medical are briefly described below.  These disciplinary actions provided Kathleen Stegman repeated notice of the state statutory and regulatory requirements for operating Midwest Medical in a legal manner.

### A.     The 2002 Consent Judgment with the Kansas Board of Healing Arts

50.     In 2002, Kathleen Stegman and the Kansas Board of Healing Arts entered into a Consent Judgment regarding physician supervision at Midwest Medical.  The key provisions of the Consent Judgment were:

> Kathleen Stegman agreed to not engage in any professional service constituting the practice of medicine and surgery in the state of Kansas.

> Kathleen Stegman agreed that she would not engage in any professional services constituting the practice of medicine and surgery unless the professional service was ordered by a person licensed to actively engage in the practice of medicine and surgery in the state of Kansas.

> Kathleen Stegman agreed that she would not engage in professional services constituting the execution of a medical regimen unless the medical regimen was prescribed by a person licensed to practice medicine and surgery in the state of Kansas.

Kathleen Stegman agreed to not dispense or administer any prescription-only drugs or devices to any person, unless she did so pursuant to the order of an individual who is authorized by Kansas law to prescribe drugs or devices or while in the course of executing that person's medical regimen as prescribed by a physician licensed to practice medicine in the state of Kansas.

Kathleen Stegman agreed to not purchase prescription-only drugs or devices.

Kathleen Stegman agreed to transfer any current ownership interest in any prescription-only drugs or prescription-only devices to a person or entity authorized by law to own prescription-only drugs or prescription-only devices.

## B.    The 2009 Consent Judgment with the Kansas Board of Healing Arts

51.    In 2009, Kathleen Stegman and the Kansas Board of Healing Arts entered into a

Consent Judgment regarding physician ownership in Midwest Medical, which is required by

Kansas Statute,[4] and false advertisement.    The key provisions of the Consent Judgment were:

Because the Board of Healing Arts had evidence of a press release that represented Kathleen Stegman to be a physician, she agreed to make reasonable efforts to identify and remove all references to "Dr. Kathleen Stegman" and Kathleen Stegman, M.D." from advertisements.

Kathleen Stegman agreed to amend Midwest Medical's Articles of Incorporation to more accurately reflect the new supervising physician's license as only a medical doctor.

Kathleen Stegman agreed that the Board will issue certification that Midwest Medical's supervising physician is licensed to practice medicine and surgery as a medical doctor consistent with Midwest Medical's Amended Articles of Incorporation, as is necessary for Midwest Medical to properly transfer shares of ownership.

## C.    2012 Consent Agreement with Kansas Board of Nursing

52.    In June 2012 Kathleen Stegman entered into a Consent Agreement with the Board

of Nursing.  The Board of Nursing found that Kathleen Stegman had violated the Kansas Nurse

Practice Act by engaging in multiple forms of unprofessional conduct, including practicing

---

[4]  *See* Kan. Stat. Ann. § 17-2710, with reference to 17-2707(b).

outside the scope of her nursing license.  Specifically, the Board of Nursing found she had

engaged in unprofessional conduct by:

> injecting drugs and devices without first conducting and documenting a nursing
> assessment of the client; and

> injecting drugs and devices without first obtaining specific orders for the location of the
> injection from a physician and the amount of the injectable to be administered.

53.     The Consent Agreement further provided:

> Kathleen Stegman agreed to immediately inform Midwest Medical's supervising
> physician (Dr. Thomas Heaphy) of the Consent Agreement.

> Kathleen Stegman agreed to submit four (4) quarterly reports from Midwest Medical's
> supervising physician (Dr. Thomas Heaphy), which would evaluate Stegman's nursing
> performance.  The quarterly reports were to include the supervising physician's signature,
> along with evaluations in the following areas:  compliance with the Kansas Nurse
> Practice Act; supervisor evaluations; overall appropriateness; and interactions with
> patients.

> Kathleen Stegman agreed to have each patient who received an injectable cosmetic
> complete a history form, which was to be reviewed by Midwest Medical's supervising
> physician prior to the administration of the cosmetic injectable.

> Kathleen Stegman agreed to complete a nursing assessment form before each cosmetic
> injectable procedure and agreed to place this form in each patient's chart.

> Kathleen Stegman agreed to administer/inject a prescription drug/device pursuant to a
> patient specific prescription/order signed by a physician and specifying the drug to be
> administered/injected, the location of the injection and the amount of the drug to be
> administered/injected.

> Kathleen Stegman agreed to not violate the Kansas Nurse Practice Act during the
> duration of the Consent Agreement.

**D.     Kathleen Stegman's Violations of Consent Agreements**

54.     The 2012 Consent Agreement Stegman entered into with the Kansas State Board

of Nursing required Stegman to immediately inform Midwest Medical's supervising physician of

the Consent Agreement.  Dr. Heaphy, who was Stegman's supervising physician at the time,

18

indicated in a May 5, 2015, interview that he had no knowledge that Stegman was under any
type of consent agreement with the Kansas State Board of Nursing.

55.     The Consent Agreement also required that certain forms, such as a patient history
and nursing assessment, be completed before cosmetic injectable procedures.  In a letter dated
April 8, 2015, to Assistant United States Attorney Tanya Treadway, Stegman's attorney stated
that no medical records for injections from 2009 forward exist.  Consequently, there is no
documentation indicating that Stegman complied with this provision of the Consent Agreement.
Moreover, there is no documentation to indicate that a physician ordered drugs/devices for any
Midwest Medical patient from 2009 forward.

56.     The Consent Agreement required four (4) quarterly reports from Midwest
Medical's supervising physician, which would evaluate Stegman's nursing performance.  The
Board of Nursing provided agents with four (4) letters from Midwest Medical indicating that
Kathleen Stegman was being evaluated by Dr. Heaphy pursuant to the 2012 consent agreement.
The letters were dated July 2, 2012; October 2, 2012; January 2, 2013; and April 2, 2013.  Each
letter contained Dr. Heaphy's signature.

57.     Agents showed Dr. Heaphy the four (4) letters.  Dr. Heaphy indicated he
remembered signing the first letter dated July 2, 2012.  Although D. Heaphy could not determine
if the signatures on the other letters were authentic, he did not remember signing the other three
letters and said he would have remembered signing such items every three months.

19

## SUMMARY OF INVESTIGATION

**Misbranded/Unapproved New Drugs – Foreign-sourced Dysport®**

58.     Kathleen Stegman and Midwest Medical first came to the attention of federal authorities in relation to another criminal investigation.

59.     In December 2012, the FDA-OCI Kansas City Field Office learned about a criminal enterprise, later identified as ABC Online Pharmacy, d/b/a Onlinebotox and/or Onlinebotox.com, a company that was smuggling misbranded and/or unapproved new drugs into the United States ("ABC enterprise").  ABC enterprise, based in British Columbia, Canada, would send "fax blasts" to physicians and businesses throughout the United States and offer prescription drugs, including Onabotulinum Toxin Type A (*i.e.,* "Botox") at greatly reduced prices.  ABC enterprise would have these misbranded and/or unapproved new drugs smuggled into the United States from across the world, including from the country of Turkey.  In order to bypass United States Customs, these illegal prescription drugs were declared as "gifts" and/or "healthcare items/remedies for personal use", and were declared for less than their actual value.  Thereafter, the illegal prescription drugs were distributed through interstate commerce throughout the United States.

60.     During the course of the ABC enterprise investigation, agents obtained a list of physicians and/or businesses purchasing these misbranded and/or unapproved new drugs.  One of these businesses was Midwest Medical, under the name of Dr. Thomas Heaphy.  According to the documents obtained, Midwest Medical received 21 shipments of misbranded and/or unapproved new drugs between December 2011 and July 2012.

61.     Based on further information developed during the investigation of the

distribution of foreign-sourced drugs by ABC enterprise, agents learned in early January 2013

that another shipment was destined for Midwest.

62.     Based on this information, on January 4, 2013, FDA-OCI Special Agents visited

Midwest Medical and attempted to interview Kathleen Stegman.  Kathleen Stegman was not at

Midwest Medical at that time, however, and the agents instead spoke with the office personnel at

Midwest Medical.  The agents asked if a shipment of prescription drugs had arrived on that date;

office personnel stated they were not aware of any shipments.  The agents left the office, and

immediately established a surveillance of Midwest Medical.  Shortly thereafter, office personnel

left the business with an empty cardboard box and threw it into a trash dumpster.  The Agents

retrieved the discarded box and determined it was received on January 4, 2013, from a shipper

associated with ABC enterprise.

63.     Later the same day, Kathleen Stegman contacted the agents and agreed to meet

for an interview at Midwest Medical.  Kathleen Stegman was interviewed and admitted to

purchasing a prescription drug (Dysport®) from ABC enterprise (onlinebotox.com).  Kathleen

Stegman claimed that she believed the product was the exact product that she would have

purchased from a legitimate supplier.  The agents informed Kathleen Stegman that the company

she was purchasing from, onlinebotox and/or onlinebotox.com, was not a legitimate distributor

for Dysport® or any other prescription drug within the United States.  The agents informed

Stegman that the drugs were illegal, not FDA approved, and were not obtained through a secure

drug supply chain; accordingly, the safety and efficacy of those drugs could not be ensured.

Kathleen Stegman was informed that counterfeit drugs can be introduced into these supply

chains, placing her clients at a risk.  The agents informed Kathleen Stegman that it was her

responsibility to conduct due diligence when purchasing prescription drugs and to contact the

manufacturer of each prescription drug to determine which companies are legitimate distributors

of the products being purchased.

64.     Kathleen Stegman admitted she possessed ten (10) packages of alleged Dysport®

at her office that she purchased from onlinebotox.  She voluntarily surrendered these packages to

the agents.  She stated she no longer purchased the Botox® product because she believed

Dysport® was a better product than Botox®.  The Dysport® products in the packages Kathleen

Stegman voluntarily surrendered had Turkish language labels and the package inserts were also

in Turkish.

65.     According to Ipsen, the manufacturer of Dysport®, the boxes obtained from

Midwest Medical in January 2013 were not FDA-approved for distribution in the United States.

Instead, the intended distribution market was Turkey.

66.     On July 11, 2013, the FDA's Office of Drug Security, Integrity, and Recalls, sent

a letter to Dr. Thomas B. Heaphy, c/o Midwest Medical Aesthetic, 11213 Nall Avenue, Suite

140, Leawood, Kansas, 66211 in regards to Midwest Medical's purchases of drugs from "Online

Botox Pharmacy", "Onlinebotox.com" and "Onlinebotox."  This letter addressed the concerns

about the "suspect version of Botox" being distributed by these companies and the possible harm

to patients because the prescription drugs may be unsafe or ineffective.  The letter identified the

discrepancies between the FDA-approved Botox® prescription drug and the non-approved FDA

version.  The letter further provided general recommendations to avoid purchasing prescription

drugs that do not comply with United States regulatory requirements.

22

67.     Previously, as far back as 2007, an Allergan sales representative, during a sales call on Midwest Medical, identified foreign-labeled Botox® located in Stegman's office. Allergan is the only manufacturer of the FDA-approved Botox® prescription drug.  The Allergan representative obtained the lot number information from the product and confirmed this product was manufactured for distribution in the country of Turkey.  The Allergan representative contacted Stegman and informed her that purchasing these products was illegal and these products could possibly be counterfeit.

68.     Recently received and reviewed invoices from various pharmaceutical supply companies, both legitimate and illegitimate, confirm that Midwest Medical purchased prescription drugs and devices from illegitimate distributors known to sell misbranded, foreign-source drugs and devices.  For example, in 2011, Midwest Medical purchased Botox® manufactured in Ireland and intended for the United Kingdom market from BDM Medical.  E-mails indicate that BD Medical informed Kathleen Stegman that the Botox® was manufactured in Ireland for the United Kingdom market.  Additionally, in 2013 and 2014, Kathleen Stegman was ordering prescription drugs and devices from Filler Depot, also known as National Health Supply, another known distributor of foreign-sourced drugs and devices.

69.     According to records obtained from drug manufacturers, Midwest Medical has not ordered several products that it continues to advertise as being available at Midwest Medical. For example, Suneva Medical, which manufactures and distributes the prescription device Artefill®/Bellafill®, has not received an order from Midwest Medical since December 2014. The December order was allegedly placed by Dr. Thomas Heaphy, but he did not order the device or authorize Stegman to order it under his name and medical license, making the device

23

misbranded. The only order Suneva has received from Midwest Medical is for a "staff box", which is essentially a sample sent at no charge for use on "staff", not on clients. Nevertheless, Midwest Medical continues to advertise the availability of Artefill®/Bellafill®.    Moreover, the Bellafill® "staff box" was allegedly ordered by Dr. Wheeler, but Dr. Wheeler denies ordering the device, and the "signature on file" for Dr. Wheeler at Suneva was dated prior to Dr. Wheeler working at Midwest Medical.

70.    Similarly, Midwest Medical has not purchased Dysport® from Galderma, the manufacturer of Dysport® 300, since June 24, 2014, and Midwest Medical has never purchased Dysport® from Ipsen Biopharmaceuticals, Inc., the manufacturer of Dysport® 500.  Again, the June 24, 2014, order was allegedly placed by Dr. Thomas Heaphy, but he denies placing any such order or authorizing Stegman to order Dysport® for any patient, making the Dysport® misbranded.  But, Midwest Medical continues to advertise Dysport® and offers Groupon coupons for Dysport.

71.    As another example, Midwest Medical did not order Botox® from Allergan from February 2009 until January 12, 2015.  On January 12, 2015, Allergan received an order, ostensibly from Dr. Maryann Campbell, and on the same date, Allergan shipped Botox® to Maryann Campbell at Midwest Medical's office.  But, Dr. Campbell did not place the order, nor did she authorize Stegman to order Botox® for any patient, making the Botox® misbranded.

72.    Dr. Campbell reviewed an application for the account with Allergan.  The document contained Dr. Campbell's signature and was dated January 8, 2015.  Dr. Campbell reported that she had never seen the application before and did not remember completing such a

form.  The signatures on the document resembled her handwriting, but Dr. Campbell could not have signed the document on January 8, 2015, because she was in Florida on vacation that day.

73.     In June 2014, the Johnson County, Kansas, District Attorney's office contacted FDA-OCI regarding Midwest Medical and Kathleen Stegman.  Based on information the D.A. received from Allergan, Stegman had been promoting and advertising the sale of Botox® and had been claiming that she was administering Botox® to patients for approximately one year (June 2013 to June 2014).   Yet, this was during a time frame when Midwest Medical ordered no Botox® from Allergan or any of its authorized distributors.

### *Advertising Botox® and other FDA-approved Drugs and Devices*

74.     Midwest Medical has long advertised, and continues to advertise, that it uses Botox®, as well as other named drugs and devices.  But, the investigation has revealed that Midwest Medical has not purchased FDA-approved drugs and devices to support the advertised treatments.  Consequently, the circumstantial evidence would indicate that if Midwest Medical is purporting to treat clients with FDA-approved drugs and devices, Midwest Medical does not have the FDA-approved drugs and devices for those treatments, making it probable that Midwest Medical is using non-FDA-approved drugs and devices which are misbranded and/or adulterated.

### *Unlawful Ordering and Dispensing of Prescription Drugs and Devices*

75.     Over the past six months, and as recently as May 2015, FDA-OCI agents have interviewed previous physicians associated with Midwest Medical.  Because the previous physicians indicated they did not order or initiate treatments for patients at Midwest Medical, the investigation has revealed that Kathleen Stegman has routinely and continually engaged in the

unauthorized practice of medicine by injecting prescription drugs and devices without the required physician orders.

76.     Dr. Thomas Heaphy, Jr., became the medical director at Midwest Medical Aesthetics in May 2011, and continued until December 2014.  Dr. Heaphy informed the interviewing agents that as medical director he signed a "Stock Issuance Agreement" with Midwest Medical Aesthetics and Kathleen Stegman.  The agreement indicated that Dr. Heaphy was issued ninety-nine (99) shares of stock at a price of one dollar per share.

77.     Dr. Heaphy described his "medical director" duties as essentially being a "file reviewer" for hair and tattoo removal services. The review of patient charts consisted of ensuring that each file was properly documented to include patient name, treatment date, treatment location, intensity of laser, and type of laser.  Dr. Heaphy stated that he did not physically see patients, nor did he consider himself to have a supervisory role at Midwest Medical.  Instead, the only person having a supervisory role was Kathleen Stegman.

78.     Dr. Heaphy stated that although he was aware that Kathleen Stegman performed cosmetic injections, he did not have any involvement in the administration or supervision of Botox®, Dysport®, or any similar injections of prescription drugs or devices.  Dr. Heaphy did not see patients prior to the patients receiving any type of cosmetic treatment, to include injections, and did not review charts for any patients treated with injections.

79.     Dr. Heaphy was shown an uncompleted and unsigned Midwest Medical document entitled "Prescription," which contained an area for Dr. Heaphy's signature and "orders" for the area of an injection and the amount of injectable to be used.  Dr. Heaphy had never seen the

document before and reported that he had never signed any such document as the supervising physician at Midwest Medical.

80.     Following Dr. Heaphy's resignation in December 2014, Dr. Mary Ann Campbell became the ostensible "medical director" of Midwest Medical.  Although Dr. Campbell was considered an owner of Midwest Medical, she did not pay anything for her shares in Midwest. She served as Midwest Medical's supervising physician from December 2014 through March 2015, with several weeks off for vacations in Florida.

81.     Dr. Campbell's duties as supervising physician included reviewing and signing off on patient charts.  Dr. Campbell reviewed patient files after the patient had already had a procedure.  From December 2014 through March 2015, Dr. Campbell never issued any patient orders, prescribed a medical regimen to any patients, and never ordered, prescribed, administered, or otherwise supervised the administration of, any prescription drugs or devices for any patients of Midwest Medical.

82.     In March 2015, Dr. Gael Wheeler purportedly served as the "back up" supervising physician while Dr. Campbell was out of town.  During Dr. Wheeler's time as the "back up" physician, she never initiated, ordered, prescribed, administered, or otherwise supervised the administration of, any prescription drugs or devices for any patients of Midwest Medical.

83.     In April 2015, following Dr. Campbell's resignation, Dr. Gael Wheeler became the primary medical director for, and gained an ownership interest in, Midwest Medical.  When Dr. Wheeler became the full time supervising physician, she called the Kanas Board of Healing Arts and did her own research to determine her responsibilities as the supervising physician.  Dr. Wheeler required that she see every patient prior to treatment.  Although Kathleen Stegman

27

complied with Dr. Wheeler's requirement for a time, Kathleen Stegman then began arguing with

Dr. Wheeler, trying to convince her that it was unnecessary for her to see patients prior to

treatments. As a result, and after consulting with an attorney, Dr. Wheeler decided that she

should leave Midwest Medical, and intends to do so once she finds an alternative place of

employment.

84.     As of March 31, 2015, Dr. Mark Strehlow is the new "back up" physician at

Midwest Medical.  Based on an interview with Dr. Strehlow on June 18, 2015, it appears that

Stegman intends for Dr. Strehlow to become the new "physician owner" of Midwest Medical

when Dr. Wheeler resigns, and it also appears that he will simply serve as a file reviewer.

85.     In Dr. Wheeler's absence on May 5, 2015, Dr. Strehlow served as the supervising

physician at Midwest Medical.  As the supervising physician, he signed off on approximately 15

patient charts.  All of the procedures in the patient charts were laser hair removal and every

procedure was done by Midwest Medical's technician.  Dr. Strehlow signed the charts after the

procedures had been performed and he did not see any patients at Midwest Medical.  Dr.

Strehlow signed the charts after Kathleen Stegman brought the records to his office, which is in a

separate building from Midwest Medical.  Dr. Strehlow was paid $100 and given a gift

certificate to a restaurant as compensation for his one day as supervising physician.

86.     Kathleen Stegman recently asked Dr. Strehlow to become the full-time

supervising physician at Midwest Medical.  Kathleen Stegman explained to Dr. Strehlow that his

responsibilities as the full time supervising physician would be to sign off on all the patient

charts for procedures and injections.  Dr. Strehlow would also ensure that Midwest Medical's

business practices are in line with the Kansas State Board of Healing Arts.  Kathleen Stegman

28

told Dr. Strehlow the full time position would only require him to sign patient charts once a week. All of the charts would be signed by Dr. Strehlow after the patient had already received the treatment. Kathleen Stegman indicated to Dr. Strehlow he would be paid $4,000 per month as the supervising physician and have a 1% ownership interest in the business.

87.     Recently on May 27, 2015, agents interviewed a current Midwest Medical employee, Virginia Mollinedo. Ms. Mollinedo has worked at Midwest Medical for five (5) years. Ms. Mollinedo confirmed that prior to Dr. Wheeler acting as the supervising physician for Midwest Medical, patients were never seen by a doctor prior to procedures being performed. She also confirmed that Kathleen Stegman performed and still performs all injections. Ms. Mollinedo's interview confirmed what the agents had learned during the following undercover activities:

88.     On June 23, 2014, an agent made an undercover telephone call to Midwest Medical at 913-327-7175, which is the phone associated with Midwest Medical's office, about scheduling an appointment for Botox® treatment. During this undercover telephone call, the employee answering the phone – Virginia – who identified herself as "Kathleen's assistant", answered questions about providing Botox® treatment at Midwest Medical. Virginia stated there was no prescription needed for the Botox® treatment and the Botox® procedure would be administered by a registered nurse who is the owner of the practice. Virginia identified this individual as Kathleen Stegman, and she stated if there were additional questions about the Botox® treatment that Kathleen could be contacted via her personal email – kstegman@kc.rr.com – located on the company's website. Virginia also stated that they obtained the Botox® from Allergan.

29

89.     On July 11, 2014, an undercover agent entered Midwest Medical and met with a staff person who identified herself as Virginia. The agent said his wife wanted Botox® treatments for wrinkles around her eyes and on her forehead. Virginia informed the agent that either Botox® or Dysport® would solve these problems. Virginia gave the agent a business card with Kathleen Stegman's email address – kstegman@kc.rr.com – so that the agent could contact Kathleen Stegman directly with any follow-up questions. During this visit, the agent saw that Midwest Medical had computers.

90.     On August 13, 2014, an agent placed a second undercover phone call to Midwest Medical at 913-327-7175, which is the phone associated with its office. During this telephone call, Virginia informed the agent that Kathleen Stegman administers all the Botox® and Dysport® injections. Additionally, Virginia stated that patients receiving Botox® and Dysport® injections do not need to see a doctor before the injection and a doctor's prescription is not required.

91.     Recently received and reviewed invoices from legitimate distributors of prescription drugs and devices confirm that for years, Kathleen Stegman has been using physicians' names to obtain prescription drugs and devices without their knowledge or authorization. The following legitimate companies sent prescription drugs and devices to Dr. Thomas Heaphy at Midwest Medical's office, although he had ordered none: Amerisource Bergen, Merz, McKesson, Suneva, and Global Bio Technology. Similarly, the following companies sent prescription drugs and devices to Dr. Maryann Campbell at Midwest Medical's office, although she had ordered none: McKesson and Suneva.

30

***Aggravated Identity Theft***

92.     In April 2015, FDA-OCI agents received documents from Suneva Medical, the distributer/manufacturer of the cosmetic filler Bellafill®, formerly branded as Artefill®. The documents included Midwest Medical's customer account applications, which allowed the clinic to order prescription drugs and devices from Suneva Medical.

93.     The Suneva Medical applications indicated that Drs. Heaphy, Campbell, and Wheeler were doctors associated with Midwest Medical. The applications included the signatures of each doctor, along with their unique medical license number.

94.     Drs. Heaphy, Campbell, and Wheeler confirmed that they were not involved in the ordering of any prescription drugs or prescription devices from Suneva Medical, including Artefill® or Bellafill®.

95.     Dr. Heaphy was shown the Suneva Medical account application, which purportedly contained his signature. Dr. Heaphy had never seen the document before. He did not believe the signature on the application was his signature and his printed name on the application was not in his handwriting.

96.     Dr. Campbell reviewed the application for an account with Suneva Medical containing her name. Dr. Campbell had never seen the document and was not familiar with Suneva Medical. She did not complete the application, but it contained her correct medical license.

97.     Dr. Wheeler stated she had never heard of Suneva Medical and had never prescribed Artefill® or Bellafill® for her patients. Dr. Wheeler has not given any orders to Kathleen Stegman to order Bellafill®.

31

98.     Dr. Wheeler was presented with the application for an account with Suneva Medical containing her name and her purported signature.  Dr. Wheeler had never seen the document and believed it was not her signature on the application.  The application was not completed in her handwriting.  The application did contain her correct medical license number.

99.     Notably, the Suneva Medical account application with Dr. Wheeler's signature was dated March 4, 2015.  But, Dr. Wheeler did not become the back-up medical director at Midwest Medical until March 6, 2015.

100.    In her May 6, 2015, interview, Dr. Wheeler provided Midwest Medical forms she found when reviewing documents to produce pursuant to a Grand Jury subpoena.  Based on the "cut and paste" look of her signature on those forms, Dr. Wheeler believes Kathleen Stegman made photocopies of her signature and copied them onto other documents to make it appear that she had ordered prescription drugs/devices and injections for Midwest Medical clients, when, in fact, she had not.

101.    On May 5, 2015, agents received information from Suneva Medical that Kathleen Stegman had ordered a "staff box" of Bellafill® under Dr. Wheeler's name.  On June 1, 2015, a Suneva representative provided information to FDA-OCI agents that Stegman was continuing to inquire about the shipment status of the Bellafill® order she placed on May 5, 2015.

102.    Artefill® and Bellafill® are prescription medical devices and are categorized as "permanent fillers."  If the injection is done incorrectly, the filler must be surgically removed. The FDA mandates prescription device manufacturers to report device-associated deaths, serious injuries, and malfunctions through what is known as an "MDR" (for Medical Device Reporting).

32

In June 2014, Suneva filed an MDR for Artefill® based on an injury sustained by a Midwest Medical client.

### Attempt to Obstruct the Investigation

103.    Dr. Wheeler provided FDA-OCI agents with an e-mail from Kathleen Stegman dated April 22, 2015, in which Stegman advised Dr. Wheeler to "have no communication with the govt." The email was sent from kmstegmanks@gmail.com.

104.    Dr. Wheeler indicated in her May 6, 2015, interview that all the patient prescription forms at Midwest Medical that had been previously kept in a plastic bin at the office had "disappeared."

### E-mail account linked to Kathleen Stegman

105.    Preliminary investigative activities disclosed that Kathleen Stegman uses an e-mail address, in part, associated with her operation and activities at Midwest Medical Aesthetics Center. During the course of the investigation, Dr. Gael Wheeler was identified as a physician who works with Kathleen Stegman at Midwest Medical Aesthetics Center. Wheeler identified one of Kathleen Stegman's e-mail addresses as kmstegmanks@gmail.com., and according to e-mails provided to investigators by Dr. Wheeler, Kathleen Stegman has utilized this e-mail account to communicate with her about ongoing activities and operations at the Midwest Medical Aesthetics Center.

106.    The following is a synopsis of some e-mails provided to investigators by Dr. Gael Wheeler, and their relevance to the investigation:

a.      On March 3, 2015, March 24, 2015, March 31, 2015, May 4, 2015, Stegman sent e-mails to Dr. Wheeler discussing various training opportunities (including via YouTube) for Dr. Wheeler to attend. The training opportunities concerned procedures allegedly performed at Midwest Medical. But, according to the agreement between Midwest Medical and Dr.

Wheeler, which was a document Stegman wrote, Dr. Wheeler was allegedly already competent to perform these procedures. The May 4th e-mail also discussed Stegman's having already been trained to perform the procedure, her plan to "show" Dr. Wheeler how to perform the procedure, and that pricing would be $500 per treatment.

b.      On April 8, 2015 and April 27, 2015, Stegman sent e-mails to Dr. Wheeler asking her to sign for prescription drug and/or device samples that Stegman had already ordered without Dr. Wheeler's involvement.

c.      On March 31, 2015, Stegman sent an e-mail to Dr. Wheeler, telling her that she was going to perform an injection like an attached You Tube video, indicating that Stegman is choosing what injections to perform, rather than performing those ordered by Dr. Wheeler.

107.    In my training and experience, I have learned that Google provides a variety of on-line services, including e-mail access, to the general public. Google allows subscribers to obtain e-mail accounts at the domain name mail.google.com like the e-mail account listed in Attachment A. Subscribers obtain an account by registering with Google. During the registration process, Google asks subscribers to provide basic personal information. Therefore, the computers of Google are likely to contain stored electronic communications (including retrieved and unretrieved e-mail for Google subscribers) and information concerning subscribers and their use of Google services, such as account access information, e-mail transaction information, and account application information.

108.    In general, an e-mail that is sent to a Google subscriber is stored in the subscriber's "mail box" on Google servers until the subscriber deletes the e-mail. If the subscriber does not delete the message, the message can remain on Google servers indefinitely. Even if the subscriber deletes the e-mail, it may continue to be available on Google's servers for a certain period of time.

34

109.    When the subscriber sends an e-mail, it is initiated at the user's computer, transferred via the Internet to Google's servers, and then transmitted to its end destination. Google often saves a copy of the e-mail sent. Unless the sender of the e-mail specifically deletes the e-mail from the Google server, the e-mail can remain on the system indefinitely. Even if the sender deletes the e-mail, it may continue to be available on Google's servers for a certain period of time.

110.    A sent or received e-mail typically includes the content of the message, source and destination addresses, the date and time at which the e-mail was sent, and the size and length of the e-mail. If an e-mail user writes a draft message but does not send it, that message may also be saved by Google but may not include all of these categories of data.

111.    A Google subscriber can also store files, including e-mails, address books, contact or buddy lists, calendar data, pictures, and other files, on servers maintained and/or owned by Google. Google also offers additional services to subscribers in addition to e-mail including, but not limited to, private chat using Google Talk, uploading and downloading media using YouTube (www.youtube.com) and Google Drive (drive.google.com), and social media sharing using Google Plus (plus.google.com). Google also stores internet browsing history, bookmarks, and other online remnants from subscribers on Google servers.

112.    Subscribers to Google might not store on their home computers copies of the e-mails stored in their Google account. This is particularly true when they access their Google account through the web, or if they do not wish to maintain particular e-mails or files in their residence.

113.    In general, e-mail providers like Google ask each of their subscribers to provide certain personal identifying information when registering for an e-mail account. This information can include the subscriber's full name, physical address, telephone numbers and other identifiers, alternative e-mail addresses, and, for paying subscribers, means and source of payment (including any credit or bank account number).

114.    E-mail providers typically retain certain transactional information about the creation and use of each account on their systems. This information can include the date on which the account was created, the length of service, records of log-in (i.e., session) times and durations, the types of service utilized, the status of the account (including whether the account is inactive or closed), the methods used to connect to the account (such as logging into the account via Google's website), and other log files that reflect usage of the account. In addition, e-mail providers often have records of the IP address used to register the account and the IP addresses associated with particular logins to the account. Because every device that connects to the Internet must use an IP address, IP address information can help to identify which computers or other devices were used to access the e-mail account.

115.    In some cases, e-mail account users will communicate directly with an e-mail service provider about issues relating to the account, such as technical problems, billing inquiries, or complaints from other users. E-mail providers typically retain records about such communications, including records of contacts between the user and the provider's support services, as well records of any actions taken by the provider or user as a result of the communications.

116.     In my training and experience, evidence of who was using an e-mail account may be found in address books, contact or buddy lists, e-mail in the account, and attachments to e-mails, including pictures and files

## INFORMATION TO BE SEARCHED AND THINGS TO BE SEIZED

117.     I anticipate executing this warrant under the Electronic Communications Privacy Act, in particular 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A), by using the warrant to require Google to disclose to the government copies of the records and other information (including the content of communications) particularly described in Section I of Attachment B. Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review that information to locate the items described in Section II of Attachment B.

## CONCLUSION

118.     Based on the above information, there is probable cause to believe that the fruits, instrumentalities, and evidence Midwest Medical and Kathleen Stegman's violations of federal (18 U.S.C. §§ 1341, 1343, 1028A, and 1512; and 21 U.S.C. §§ 331(c) and (k)), will be found in the Google services account listed in this affidavit, including Google e-mail, Google Talk, Google Plus, YouTube, Google Drive, and saved internet brosing, searching, and bookmark data.

119.     This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711.  18 U.S.C. §§ 2703(a), (b)(1)(A) & (c)(1)(A).

120.    Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant.

I declare upon the penalty of perjury that the information contained herein is true and correct to the best of my knowledge.

<div style="margin-left:40%">

_s/ Bradley Cooper_____
Bradley Cooper
Special Agent
Food & Drug Administration
Office of Criminal Investigations

</div>

Subscribed and sworn to before me this 10th  day of August 2015.

<div style="margin-left:40%">

_s/ K. Gary Sebelius_____
United States Magistrate Judge

</div>

38

## **ATTACHMENT A**

### **Property to Be Searched**

This warrant applies to information associated with the Google Online Services user account kmstegmanks@gmail.com, known to be operated by Kathleen Stegman, that is stored at premises owned, maintained, controlled, or operated by Google Online Services.

The location, property, and records to be searched are located at and described as:  Google, Inc., Google Custodian of Records, 1600 Amphitheatre Parkway, Mountain View, CA 94093, telephone number:  (650) 253-3425, fax number:  (650) 649-2939, Custodian of Records fax number:  (650) 249-3429, email address:  legal-support@google.com.

## ATTACHMENT B

### Particular Things to be Seized

I.    To the extent that the information in Attachment A is within the possession, custody, or control of Google, including any messages, records, files, logs, or information that have been deleted but are still available to Google, or have been preserved pursuant to a request made under 18 U.S.C. § 2703(f), Google is required to disclose the following information to the government for the accounts listed in Attachment A:

a.   All contact and personal identifying information, including Kathleen Stegman, Google Online Services user accounts kmstegmanks@gmail.com, or any other known account associated with the ownership of the name Kathleen Stegman;

b.   All activity logs for the accounts and all other documents showing the user's online activities;

c.   The contents of all emails associated with the account, including stored or preserved copies of emails sent to and from the account, draft emails, the source and destination addresses associated with each email, the date and time at which each email was sent, and the size and length of each email;

d.   The contents of all historical browsing history associated with the account including, but not limited to, browsing history, search history, map searches, image searches, etc. Include the source and destination addresses associated with the websites visited, including the date and time visited;

e.   The contents and/or description of all uploaded and downloaded media associated with the account's access to YouTube.com, including the source and destination addresses and date and time at which each session took place;

f.   All profile information including, but not limited to, subscriber names, addresses, and telephone numbers;

g.   All other records of communications and messages made or received by the user including all private messages, and chat history;

h.   All IP logs, including all records of the IP addresses that logged into the account;

i.   The length of service (including start date), the types of service utilized by the user, and the means and source of any payments associated with the service (including any credit card or bank account number);

1

    j.   All records pertaining to communications between Google and any person regarding the user or the user's Google account, including contacts with support services and records of actions taken.

II.    The following items are to be seized as evidence, fruits, and instrumentalities of violations of federal law (18 U.S.C. §§ 1341, 1343, 1028A, and 1512; and 21 U.S.C. §§ 331(c) and (k)) since 2010.

    a.   All communications with Kathleen Stegman, and the Midwest Medical Aesthetics Center;

    b.   All records, information, documents, materials and communication relating to the Kathleen Stegman and the Midwest Medical Aesthetics Center;

    c.   All records, information, documents, materials and communication relating to the purchase, sale, shipment, handling, importation, or distribution of all versions, foreign and domestic, of Artefill, Bellafill, Belotero Balance, Belotero Basic, Botox, Dysport, Juvederm,  Perlane, Restylane, Perlane, Radiesse, Sculptra, Xeomin or any drugs or devices unlawfully imported into the United States, including but not limited to prescriptions, bills, invoices, bills of lading, shipping documents, purchase orders, letters, notes, and other forms;

    d.   All records, information, documents, materials and communication concerning the administration of all versions, foreign and domestic, of Artefill, Bellafill, Belotero Balance, Belotero Basic, Botox, Dysport, Juvederm,  Perlane, Restylane, Perlane, Radiesse, Sculptra, Xeomin, or any drugs or devices unlawfully imported into the United States;

    e.   All records, information, documents, materials and communications with others concerning the acquisition, retention, or distribution of all versions, foreign and domestic, of Artefill, Bellafill, Belotero Balance, Belotero Basic, Botox, Dysport, Juvederm,  Perlane, Restylane, Perlane, Radiesse, Sculptra, Xeomin, or any drugs or devices unlawfully imported into the United States;

    f.   All records, information, documents, checks, money orders, financial records, bank statements, or other financial documents or materials, and communication reflecting payment, receiving payment, or other transfer of funds in connection with the acquisition, purchase, procurement, disbursement, or distribution of Artefill, Bellafill, Belotero Balance, Belotero Basic, Botox, Dysport, Juvederm, Perlane, Restylane, Perlane, Radiesse, Sculptra, Xeomin, or any drugs or devices unlawfully imported into the United States or any other foreign sourced unapproved drugs or devices unlawfully imported into the United;

2

g.  All records, information, documents, materials, and communication relating to patient files and patients billing records, information, and documents related to the purchases, selling, and consultation of services related to the administration of all versions of Artefill, Bellafill, Belotero Balance, Belotero Basic, Botox, Dysport, Juvederm,  Perlane, Restylane, Perlane, Radiesse, Sculptra, Xeomin, or any other foreign sourced unapproved drugs or devices unlawfully imported into the United States;

III.    As used above, the terms "records", "information", "documents", "materials", and "communication" include items in whatever form and by whatever means, the records, information, documents, or materials, and their drafts or their modifications, may have been created or stored.

3